

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK MONTALTO,                              )
                                            )
                    Plaintiff,              )
                                            )    No. 17 C 5976
        v.                                  )
                                            )    Magistrate Judge Sidney I. Schenkier
NANCY A. BERRYHILL, Acting                  )
Commissioner of Social Security,            )
                                            )
                    Defendant.              )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Mark Montalto, has seeks the reversal or remand of the final decision of the

Acting Commissioner of Social Security ("Commissioner") denying his claim for Social Security

disability benefits (doc. # 14). The Commissioner has filed a motion for summary judgment, in

which she asks that the Court affirm the decision (doc. # 27). For the reasons that follow, we deny

Mr. Montalto's motion and grant defendant's motion.

### I.

Mr. Montalto filed a claim for disability insurance benefits ("DIB") in June 2013, alleging

that he was unable to work because of bulging and degenerative discs at L-4-L-5 and S-1, back

pain, leg pain, depression, and high cholesterol; he contends the onset date of his disability was

April 1, 2013 (R. 83). Mr. Montalto's claim was initially denied initially on October 23, 2013 and

on reconsideration on August 18, 2014, after which he requested a hearing before an

Administrative Law Judge ("ALJ") (R. 93, 105). On March 1, 2016, the ALJ ended the first hearing

because of a lack of record evidence (R. 74-82). On June 23, 2016, the ALJ reconvened the hearing

after receiving plaintiff's medical records (R. 41-73). She issued an opinion denying Mr.

---

[1] On May 14, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this
case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 26).

Montalto's claim for benefits on July 26, 2016 (R. 14-37). On June 22, 2017, the Appeals Council upheld the ALJ's determination, making it the final opinion of the Commissioner (R. 1-6). *See* 20 C.F.R. § 404.981; *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

II.

We begin with a review of the evidentiary record relevant to our decision.

A.

Plaintiff was diagnosed with degenerative disc disease by surgeon Richard Lim, M.D., after an MRI on February 19, 2013 (R. 345, 370). Dr. Lim subsequently performed spinal fusion surgery on April 4, 2013, to repair a disc protrusion at L-4, L-5 (R. 56-57, 233). At his initial post-surgery follow up appointment on April 16, 2013, plaintiff reported continued leg pain, but tolerable pain in his back (R. 369). Neurologically, Mr. Montalto's strength had improved to 5/5; he still experienced some tightness in his right hamstring during a straight leg raise test, but was otherwise doing well (*Id.*). At his next appointment with his surgeon on May 14, 2013, plaintiff reported continued leg pain but no back pain, and that he had stopped taking the prescription pain medication, Norco. Dr. Lim's review of plaintiff's post-surgery x-ray showed that the spinal fusion was healing well (R. 368, 384).

In May 2013, plaintiff also began physical therapy; at his initial consultation, Mr. Montalto rated his pain level at 3/10 (R. 393). At a June 14, 2013 appointment with Dr. Lim, Mr. Montalto reported that he was "not making significant improvement"; his surgeon speculated that plaintiff had plateaued with therapy (R. 367). A report from the physical therapist from June 26, 2013, noted that Mr. Montalto reported not feeling better since starting therapy, but that electrical stimulation helped with his pain, which he rated as 3-6/10 (R. 390). At plaintiff's next appointment, on August 6, 2013, Dr. Lim wrote that plaintiff "reports he is still having the back pain symptoms

into his legs" (R. 366). At this appointment, plaintiff also told his doctor that he had an E-Stim unit, which seemed to help with his symptoms; Dr. Lim wrote a prescription for plaintiff to have home E-Stim (*Id.*).[2]

On September 10, 2013, plaintiff reported to Dr. Lim that he was getting no pain relief for his leg pain from prescribed Lyrica (R. 420). Dr. Lim noted that a September 2013 x-ray showed arthritic changes in both hips; he speculated that the arthritic changes or nerve damage might be the source of plaintiff's continued pain (R. 422). Dr. Lim referred plaintiff to one of his associates, Luis Redondo, M.D., for steroid injections (R. 420). Dr. Redondo examined plaintiff in January 2014, and noted a good range of motion in his right hip and a positive FABER test, causing hip pain (R. 417).[3] Dr. Redondo interpreted the September 2013 x-ray as showing mild degenerative change of the right hip; Dr. Redondo's notes indicate a plan to give Mr. Montalto cortisone shots to alleviate his pain (R. 417, 421). Plaintiff had a cortisone injection in his right hip on January 22, 2014 (R. 418).

In May 2014, Mr. Montalto visited the Advocate Christ Medical Center pain clinic with complaints of low back pain, with radiation of pain down his right leg and occasional back spasms (R. 473). Plaintiff told Yaw Donkoh, M.D., that his pain level was at 4/10, but could be more severe at times (*Id.*). Dr. Donkoh subsequently gave Mr. Montalto a series of three epidural injections in his back between October 6, 2014 and December 4, 2014 (R. 428-30). At the time of his third injection, Mr. Montalto told Dr. Donkoh that his pain level was "5-6/10," and that the

---

[2] E-Stim is a pain management technique that uses a small device to deliver mild electrical pulses either topically or through an implant underneath the skin. It is designed to alter nerve activity in a specific part of the body to reduce pain. *See,* https://www.mayoclinic.org/self-care-approaches-to-treating-pain/art-20367322, https://connect.mayoclinic.org/discussion/spinal-cord-stimulation-2/ (visited on February 11, 2019).

[3] The FABER test stands for: Flexion, Abduction and External Rotation. These three movements combined result in a clinical pain provocation test to assist in diagnosis of pathologies at the hip, lumbar and sacroiliac region. https://www.physio-pedia.com/FABER_Test#cite_note-martin_et_al-1 (visited on February 22, 2019).

first two injections had not alleviated any pain (R. 428-29). Next, between January 26, 2015 and November 19, 2015, Mr. Montalto underwent a trial and then permanent surgical placement of a spinal cord stimulator (R. 433-34, 440-42, 451). According to progress notes from Dr. Donkoh, in January 2015, Mr. Montalto rated his pain as 6-7/10; in June 2015, as 3/10; and in November 2015, Mr. Montalto was "quite pleased with the progress he has made" with the stimulator (R. 433, 460).

In January 2016, Mr. Montalto reported to Dr. Donkoh that his pain level was at "5/10," and he was taking the same amount of pain medication as he had before insertion of the E-Stim device (R. 454-55). On March 11, 2016, plaintiff reported a pain level of "4/10" with the stimulator, and that he was having some discomfort in his groin area, but did not need to increase his pain medication (R. 497).

**B.**

In addition to seeing Drs. Lim, Redondo, and Donkoh for treatment for his back and leg pain, Mr. Montalto also had appointments at Advocate Lutheran hospital with his primary care doctor Vanessa Hagan, M.D. Dr. Hagan's notes document that she treated Mr. Montalto for back issues and depression beginning in January 2012; the record contains progress notes from only two visits Mr. Montalto had with Dr. Hagan after his alleged onset date, although Dr. Hagan was copied on notes from plaintiff's treatment with Dr. Donkoh. On November 5, 2013, a treatment note from Dr. Hagan reported in the "history of present illness" ("HPI") section that Mr. Montalto complained of chronic low back pain that was worse with activity or movement or when standing, and better with medication (R. 407). Dr. Hagan's examination found no tenderness in plaintiff's spine, normal bilateral lower extremities, and a negative straight leg test (R. 407-08). Dr. Hagan's notes also assessed Mr. Montalto as having generalized anxiety disorder and depressive disorder; he was taking the anti-depressant medication Cymbalta at the time (*Id.*). Dr. Hagan's second set

of notes, from plaintiff's visit on February 18, 2014, repeated the same HPI and added elsewhere that plaintiff reported back pain and spasms when he walked quickly, in addition to depression and reflux (R. 409).

On June 15, 2015, Dr. Hagan completed a Residual Functional Capacity ("RFC") form for Mr. Montalto, opining there that his symptoms began on January 28, 2012 (R. 411-13). In her RFC assessment, Dr. Hagan wrote that she saw Mr. Montalto for "30 minute office visits every 3 months" for spinal stenosis, and that his prognosis was guarded (R. 411). She listed plaintiff's symptoms as "back pain, dizziness, leg pain," and characterized his pain as "back pain and neck pain," and wrote that he had trouble walking (*Id.*). Dr. Hagan circled options on the RFC form opining that Mr. Montalto would experience constant pain interfering with the attention and concentration he would need to work, that he could walk no city blocks without resting, and that he could sit or stand for 10 minutes at a time before needing to change position (*Id.*). She also opined that Mr. Montalto could sit, stand, or walk for a total of less than two hours in an eight-hour work day, and that because of muscle aches and chronic fatigue, plaintiff would need to walk around for eight minutes and/or take a 10-minute rest break 10 times every day.[4] Elsewhere in the RFC, Dr. Hagan opined that plaintiff would need to keep his legs elevated 50 percent of an eight-hour work day, and that he was limited to using his arms, hands, and fingers for reaching, grasping, and fine manipulations for only 25 percent of an eight-hour workday (R. 412).

## C.

Mr. Montalto was also evaluated by Commission physicians as part of his claim for benefits. On October 7, 2013, psychologist, Jeffrey Karr, Ph.D., examined Mr. Montalto and

---

[4] The sections on the RFC form asking about walking breaks and rest break are separate; it's not clear whether Dr. Hagan opined that Mr. Montalto would need both an eight-minute walk 10 times per day and a 10-minute rest 10 times per day, or if he needed a total of 10 breaks per day, some resting and some walking.

diagnosed him with adjustment disorder with mixed emotional features; Dr. Karr noted that plaintiff appeared physically uncomfortable at times and opined that Mr. Montalto's anxiety and depression were principally a result of his health concerns (R. 397-400). Agency physician, Lionel Hudspeth, Psy.D., reviewed Dr. Karr's report and opined that plaintiff had no restrictions in his activities of daily living, and mild difficulties in maintaining social functioning and in concentration, persistence and pace, but that these limitations were "more likely related to physical and life circumstance issues rather than due to a severe mental disorder" (R. 87). Therefore, Dr. Hudspeth opined Mr. Montalto had a non-severe mental impairment (*Id.*). Leon Jackson, Ph.D., affirmed this opinion on August 4, 2014 (R. 99).

State agency doctor, Peter Biale, M.D., examined plaintiff with respect to his physical impairments on October 15, 2013. In his examination report, Dr. Biale noted that plaintiff drove himself to the appointment and that his range of motion in his lower spine was limited and tender, and that plaintiff had a positive straight leg test at 10 degrees and diminished sensation in his left lower extremity (R. 403).[5] Dr. Biale also noted that plaintiff used a non-prescribed cane because it gave him a sense of security and allowed him to walk faster (R. 403-04). In his conclusions, Dr. Biale wrote "due to all these problems, the plaintiff is still unable to work" (R. 405).

On October 22, 2013, agency physician, Victoria Dow, M.D., completed an RFC for Mr. Montalto after reviewing Dr. Biale's examination reports (R. 89). Dr. Dow noted that Mr. Montalto used a cane for a sense of security, but that he had a normal gait and was able to walk farther than 50 feet without it (*Id.*). The doctor noted that plaintiff had some trouble squatting and with heel/toe walk and had a positive straight leg test (*Id.*). Dr. Dow assessed Mr. Montalto as having an RFC to sit, stand, or walk for up to six hours in an eight-hour workday with normal breaks, and to

---

[5] Three weeks later, on November 5, 2013, plaintiff had a negative straight leg test at an appointment with Dr. Hagan (R. 407).

occasionally climb ladders, stoop, or crouch (R. 89-90). Dr. Dow also opined that Mr. Montalto did not have a medical need for a cane and that he was not disabled, because he was expected to recover from his disability within 12 months of onset (R. 90). Young-Ja Kim, M.D., affirmed this assessment on reconsideration on August 8, 2014 (R. 102).

### D.

At the hearing, Ashok Jilhewar, M.D., testified as a medical expert (R. 56). Dr. Jilhewar summarized all of plaintiff's medical procedures and appointments, opining that the only severe impairment documented in the medical record was chronic pain syndrome, attributed by treating sources to the degenerative disc disease in the lumbar spine (*Id.*). Dr. Jilhewar stated that he did not agree with Dr. Hagan's RFC because he could not find abnormal clinical findings, particularly neurological abnormalities, that supported Dr. Hagan's conclusion (R. 60). Dr. Jilhewar also testified that he believed plaintiff met Listing 1.04 A for the closed period between plaintiff's surgery and November 2015, when plaintiff reported he was "quite pleased" with his progress after placement of the permanent E-Stim unit (R. 63). The ALJ asked Dr. Jilhewar about the reasons for his opinion that plaintiff met a Listing for the closed period, and Dr. Jilhewar stated it was "because of procedures . . . nothing more . . . that is the only reason" (R. 65).

### III.

"We will review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence." *Decker v. Colvin*, No. 13 C 1732, 2014 WL 6612886 at *9 (N.D. Ill. Nov. 18, 2014). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480 at *4 (N.D. Ill. May 6, 2015). The Court will not reweigh evidence or substitute its own judgment for that of the ALJ. *Decker* 2014 WL 6612886 at *9. In rendering a decision, the ALJ "must build a

logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Id.*, *quoting Schmidt v. Barnhart,* 395 F.3d 737, 744 (7th Cir. 2005). Instead, the Court must be able to trace the ALJ's reasoning from the evidence to the result. *Minnick v. Colvin,* 775 F.3d 929, 938 (7th Cir. 2015).

In her opinion, the ALJ went through the familiar five-step process for determining disability. 20 CFR 404.1520(a) and 416.920(a). At Step One, the ALJ determined that Mr. Montalto had not engaged in substantial gainful activity since his onset date (R. 19). At Step Two, the ALJ found that Mr. Montalto had the severe impairments of degenerative disc disease of the lumbar spine post laminectomy and mild obesity (*Id.*). Plaintiff's other impairments, including his GERD, mild degenerative hip disease, and depression were non-severe (R. 20). Specifically, Mr. Montalto's degenerative joint disease of the hip was non-severe because diagnostic testing revealed only mild arthritic change; his leg pain was related to his degenerative disc disease (*Id.*). Mr. Montalto's depression and other mental health impairments were non-severe because they caused no more than minimal limitations on his ability to work; the ALJ noted that plaintiff was first diagnosed with depression prior to his alleged onset date and was able to continue to work for more than a year afterwards (R. 20). The ALJ also stated that plaintiff had very few visits with his primary care doctor, which contradicted his allegations of significant limitations due to mental and physical impairments (*Id.*).[6] Nevertheless, the ALJ considered plaintiff's hip and leg pain and mental health issues in assessing his RFC (*Id.*).

---

[6] The ALJ acknowledges that plaintiff also visited his surgeon and several pain specialists for treatment on a number of occasions. However, plaintiff's evidence that his limitations were severe enough to preclude any work stemmed only from Dr. Hagan's opinion; he does not argue that treatment notes or other evidence from Drs. Lim, Redondo, or Donkoh established a disability, only that they supported his complaints of pain. The ALJ incorporated their findings into her assessment of plaintiff's RFC.

At Step Three, the ALJ found that Mr. Montalto's impairments did not meet or medically equal a Listing (R. 22-25). In so finding, the ALJ explained her reasoning, reviewing and analyzing all of the medical record. The ALJ stated that she rejected the opinion of testifying expert Dr. Jilhewar that plaintiff met Listing 1.04A because Dr. Jilhewar based his opinion solely on the procedures plaintiff had (R. 25). The ALJ pointed out that she could not rely only on procedures, but had to look at "the objective clinical exam findings, medications, treatment and the other evidence of record (*Id.*). The ALJ also pointed out that Dr. Jilhewar acknowledged that the plaintiff did not have any neurological findings, which is one factor required to meet Listing 1.04A (*Id.*).

Before reaching Step Four, the ALJ assigned Mr. Montalto a Residual Functional Capacity ("RFC") to perform sedentary work "except that he can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; he can occasionally balance, stoop, kneel, crouch and crawl he can tolerate no exposure to or work around vibrations, hazards, moving machinery or unprotected heights; he can perform simple routine tasks requiring no more than short simple instructions and simple work related decisions making with few work place changes" (R. 25). In making her RFC finding, the ALJ discussed her assessment of plaintiff's symptoms and the credibility of plaintiff's statements about his symptoms' intensity, persistence, and limiting effects, as we explain later in this opinion. At Step Four, the ALJ found that plaintiff was unable to perform his past work as mail room supervisor and sales support order clerk, which were skilled or semi-skilled jobs (R. 30). At Step Five, the ALJ found that significant jobs existed at the sedentary and unskilled level that plaintiff would be able to perform, including information clerk, order clerk, and credit card interviewer, and therefore, he was not disabled (R. 31).

## IV.

In his motion for reversal or remand, Mr. Montalto contends that the ALJ made three errors. Specifically, he argues that that ALJ: (1) failed to assess his subjective allegations of the severity of his pain according to SSR 16-3p; (2) erred in evaluating Mr. Montalto's depression; and (3) erred in evaluating the medical opinions as required by 20 C.F.R. § 404.1527. We discuss each of these challenges in turn.

### A.

Plaintiff contends that when evaluating his symptoms, the ALJ violated SSR 16-3p by failing to explain why she found that plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record" (Pl. Mem. in Support at 7). Plaintiff offers six instances in which he contends the ALJ failed to properly evaluate his claims of pain. However, we conclude that the ALJ's opinion as a whole shows that she sufficiently explained how she evaluated Mr. Montalto's symptoms and determined that they did not support a finding of disability.

### 1.

Plaintiff contends generally that the ALJ impermissibly relied on a lack of consistent, supporting objective medical evidence to discount his complaints of pain (Pl. Mem. at 8). This is not an accurate characterization of the ALJ's analysis of Mr. Montalto's complaints about his symptoms.

The applicable regulations state that the Commission "will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." 20 CFR 404.1529 and 416.929. Minimal or negative findings, or the

existence of inconsistencies in the objective medical evidence are relevant considerations when evaluating a plaintiff's allegations of the intensity, persistence, and limiting effects of his or her symptoms. SSR 16-3p. However, other evidence must be considered as well: (1) statements from the individual, medical sources, or any other sources of information about the plaintiff's symptoms; and (2) the factors listed in 20 C.F.R. 404.1529(c)(3) and 416.929(c)(3), including daily activities, the location, duration, frequency, and intensity of pain, anything that precipitates or aggravates symptoms, medications taken to alleviate symptoms, treatment other than medication, and measures other than treatment the individual uses to alleviate pain. *Id.*

Contrary to plaintiff's argument, the ALJ here did consider the other relevant factors in addition to the objective evidence in determining that Plaintiff's statements about the intensity, persistence and limiting effects of his impairments were not entirely credible. The ALJ acknowledged Plaintiff's complaints of pain to his surgeon and to Dr. Donkoh at the pain clinic, noted the minimal effectiveness of physical therapy and epidural injections on Plaintiff's pain, and recognized the objective medical evidence of Plaintiff's impairment, including several positive straight leg raise tests, diminished sensation of his lower extremity, an x-ray showing mild degenerative changes of the hip, and trouble squatting and heel-to-toe walk (R. 22). She concluded that "the record supports leg pain related to [Plaintiff's] degenerative disc disease" (R. 20). Where the parties disagree is in whether the ALJ properly explained her reasons for rejecting Plaintiff's contentions about the severity of his pain, and whether its limiting effects rendered him unable to work.

The Court will uphold an ALJ's credibility finding unless Plaintiff demonstrates that it is patently wrong, although the ALJ "still must competently explain an adverse-credibility finding with specific reasons supported by the record." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir.

2015). After reviewing the ALJ's credibility analysis, we do not find it patently wrong. In so finding, we note that the ALJ did not reject Plaintiff's allegations of pain outright, or find that his testimony entirely lacked credibility. Instead, the ALJ accepted that Plaintiff continued to experience pain and limitations, and then pointed to specific evidence in the record that caused her to question Mr. Montalto's allegation that his pain was severe enough to render him unable to work at all. *See, Slayton v. Colvin*, 629 Fed.Appx. 764, 770 (7th Cir. 2015) (upholding ALJ's credibility determination where he relied on a number of factors in addition to lack of objective medical evidence supporting Plaintiff's allegations of pain); *Schmidt v. Astrue,* 496, F.2d 833, 843-44 (7th Cir. 2005) (ALJ credibility findings not patently wrong where he considered testimony, normal examination findings, and daily activities in addition to objective medical tests).

For example, the ALJ noted that while Mr. Montalto testified at the hearing that the E-Stim never improved his symptoms, medical records reflect Plaintiff reporting that he was "quite pleased" with his progress resulting from the E-Stim device (R. 23). And while the ALJ acknowledged that Plaintiff continued to seek treatment for pain after surgery, examinations throughout the claims period also show normal sensory and motor skills, no spinal tenderness, some negative (and some positive) straight leg tests, normal extremity strength, and normal range of motion in his back (R. 24). The ALJ also points out that Mr. Montalto almost always presented for treatment in no acute distress, generally reported pain levels in the mild-to-moderate range, and often went for months between appointments, all of which contradicted his allegation of constant, debilitating pain (R. 26).

The ALJ also considered the statements of both plaintiff and his wife in assessing the severity of Mr. Montalto's symptoms. The ALJ noted that Mr. Montalto's wife reported that he spent his days lying in a recliner, but that he also took care of their eight-year-old son and went to

their children's sporting events (R. 21). Although Mr. Montalto himself testified at the hearing that he only occasionally attended his children's sporting events, in his function report, he stated that he attended their sporting events every night (R. 26, 288). In addition, the ALJ explained that, contrary to plaintiff's testimony that he did no chores other than wiping down countertops, Mrs. Montalto reported that plaintiff did some cleaning and laundry, as long as he was not required to bend down (R. 27).

Plaintiff contends the ALJ impermissibly "played doctor" by suggesting that if plaintiff's pain was really so severe that he had to spend the entire day in his recliner, his medical examinations would reveal more physical limitations, such as reduced muscle strength or atrophy, when in fact they showed normal strength, lack of fatigue or weakness, and no weight gain or loss (Pl. Mem. at 8). Plaintiff concedes that regulation SSR 16-3p specifically suggests that an individual who can walk or stand for no more than minutes per day because of pain should in fact show signs of muscle wasting, but argues that this example does not apply to Mr. Montalto because he does not lie down "most of the day," but instead "has to lie down periodically throughout the day" (Pl. Mem. at 8-9).

This is an inaccurate characterization of Plaintiff's own report of his recliner use. The record evidence to which plaintiff himself cites states that he sits his recliner "all day," spending "considerable" time in a recliner, and having to keep his legs elevated "all the time" in a recliner (R. 53, 276, 397). Elsewhere in the memorandum, plaintiff acknowledges that he spends the majority of the day in his recliner (Pl. Mem. at 11). Mr. Montalto cannot have it both ways: either he is in so much constant pain that he must spend his days in a recliner (and thus should be exhibiting muscle wasting and weakness), but if not, the ALJ reasonably concluded that his pain is not as severe as he claims. The ALJ's recognition of the inconsistency between Mr. Montalto's

13

physical signs and symptoms and his contention that he rarely leaves his recliner is adequately supported by the record and consistent with the regulations. In short, we find that the ALJ's discussion and analysis of the record adequately supported her finding that Mr. Montalto's characterization of pain and limited activity were not supported to the extent alleged (R. 27).

## 2.

The ALJ did not impermissibly consider Mr. Montalto's cane use when assessing the severity of his pain. Contrary to Plaintiff's characterization, the ALJ did not question Mr. Montalto's credibility because he used a non-prescribed cane to ambulate. Instead, the ALJ explained in detail why Plaintiff's cane use did not support his contention that his pain is so severe that he is unable to work. Specifically, the ALJ explained that at his consultative examination, Mr. Montalto told the doctor that he used a non-prescribed cane not due to pain, but because it gave him a sense of security and allowed him to walk faster (R. 22). At the same time, he was able to walk greater than 50 feet without the cane, was able to bear his own weight, and had a normal gait (R. 23, 27). Other than at the consultative examination and hearing, none of the medical records document Mr. Montalto's cane use. The ALJ nevertheless reduced Plaintiff's RFC to sedentary work that would be more consistent with cane use if he felt more comfortable (R. 27). The ALJ did not improperly consider Mr. Montalto's use of a cane in assessing the credibility of his testimony regarding the extent of his pain.

## 3.

The Seventh Circuit cautions against an ALJ equating the ability to perform certain daily activities with the ability to work full-time. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Contrary to Plaintiff's characterization, the ALJ did not discuss his daily activities to demonstrate that Plaintiff absolutely had the ability to work. Instead, the ALJ pointed out certain inconsistencies

(described above) between plaintiff's function reports, his testimony, and his wife's statements about the extent of plaintiff's ability to complete various daily activities, as support for her determination that Mr. Montalto's allegations about the severity and pervasiveness of his pain was not entirely credible. There was no error in doing so.

## 4.

Mr. Montalto briefly mentions the ALJ's discussion of the fact that the record supports a finding that treatment and medication improved plaintiff's condition, and then incongruously states that "the fact that Mr. Montalto's condition was stable during the relevant period merely means that his pain was not improving or getting worse" (Pl. Mem. at 10). Plaintiff does not explain or provide any legal support for the proposition that improvement through treatment and medication is equivalent to stability of condition. Plaintiff's argument also ignores evidence that Mr. Montalto reported progress, shown with the use of the E-Stim unit (R. 433, 494). We find this assignment of error to have no merit.

## 5.

Plaintiff argues that the ALJ failed to properly analyze his need to rest throughout the day (as evidenced by his claim he spends the majority of the day in his recliner). Again, plaintiff mischaracterizes the ALJ's opinion and the record. As we described above, the ALJ did in fact discuss Mr. Montalto's alleged recliner use and how it was not consistent either with his physical state on examination or his routine attendance at his children's sporting events. And, as explained above, Mr. Montalto's concurrent argument that he did not need to stay in the recliner for extended periods each day is at tension with his own statements. The ALJ committed no error in her consideration of that evidence in assessing the credibility of Mr. Montalto's testimony concerning his pain.

**6.**

Plaintiff contends that the ALJ merely summarized the medical evidence and did not analyze it, as required to build a logical bridge from evidence to conclusion. We disagree. The ALJ's opinion is nearly 15 pages long, and analyzes plaintiff's entire medical history during the relevant time period. The ALJ discusses how plaintiff's medical examinations, tests, and various treatments supported or did not support his complaints of pain, and how the medical record, including objective evidence and medical opinion, supported the RFC decision. Plaintiff's attempt to characterize the ALJ's opinion as mere summary does not make it so, and we find that, the ALJ's analysis was adequately in-depth and considered to allow us to trace her reasoning to her conclusion.

**B.**

Plaintiff contends that the ALJ did not adequately evaluate the evidence concerning depression. At Step Two of the sequential analysis, the ALJ determined that Mr. Montalto's depression was a non-severe impairment (R. 20). Plaintiff does not dispute the finding of non-severity, but instead argues that although the ALJ found Mr. Montalto to have mild impairments in social functioning and concentration, persistence, and pace, she failed to include these limitations in her RFC. Specifically, plaintiff argues that all three of the jobs the ALJ found plaintiff was able to perform – information clerk, order clerk, and credit card interviewer – require customer interaction that may be at odds with Mr. Montalto's mild limitations in social functioning (Pl. Mem. at 12-13).

Contrary to plaintiff's argument, the ALJ did in fact consider plaintiff's mild mental health limitations when determining his RFC and finding him able to perform certain jobs. In her analysis of plaintiff's mental health pursuant to the "Paragraph B" factors, the ALJ commented that plaintiff

has a good friend who visits him, he sees his father and sister occasionally, is married with children, and at medical appointments, presented as cooperative (R. 21). The ALJ explained that she found plaintiff to have a mild limitation specifically because he reported socializing less because of "pain and his physical medical condition over any mental health impairment" (R. 21). The ALJ did not find plaintiff to have a mental health impairment that made it difficult for him to interact with people *per se*, which would affect his ability to perform a job that requires interaction with the public. Instead, plaintiff self-reported the fact that his limited his social engagements because of pain. By giving plaintiff a sedentary RFC, the ALJ accounted for Mr. Montalto's physical limitations, including limitations resulting from his pain which might have affected his social functioning. Thus, we find that any mild limitations in social function are adequately accounted for in the RFC. *See, Suzanne M. v. Commissioner of Social Security*, No. 17-cv-1425, 2018 WL 6817029 *6 (C.D. IL November 9, 2018) (ALJ adequately accounted for plaintiff's non-severe, mild mental limitations in RFC where such limitations were attributable to her physical symptoms and not her mental health).

## C.

Finally, plaintiff contends that the ALJ erred in evaluating the various medical opinions in the record as required by 20 C.F.R. §404.1527. Specifically, plaintiff contends that the ALJ wrongly gave "no weight" to the RFC opinion of Mr. Montalto's treating doctor, Vanessa Hagan, and wrongly discounted the opinion of testifying medical expert, Dr. Jilhewar, that plaintiff's impairments met a Listing for the closed period between April 4, 2013 (the date of his surgery) and November 9, 2015. We disagree and find that the ALJ adequately explained her reasoning behind the weight she gave to Drs. Hagan and Jilhewar's opinions.

**1.**

We begin with Dr. Hagan, whom the parties agree qualifies as a treating physician. "And though treating physician's opinions . . . are usually entitled to controlling weight, *see* 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, an ALJ may discredit the opinion if it is inconsistent with the record." *Winsted v. Berryhill,* 915 F.3d 466, 472 (7th Cir. 2019).[7] If an ALJ does not give controlling weight to a treater's opinion, he or she must consider factors including the length, nature, and extent of the treatment relationship, the doctor's medical specialty, the types of tests performed, and consistency of the opinion with the medical evidence as a whole. *Derry v. Berryhill,* No. 18-1654, 2019 WL 102477 at *4 (7th Cir., January 4, 2019).

Throughout her opinion, the ALJ found Dr. Hagan's RFC assessment both inconsistent with the bulk of the medical evidence (including Dr. Hagan's own notes), as well as otherwise unworthy of controlling (or any) weight. The ALJ adequately supported that conclusion.

*First,* the ALJ noted that Dr. Hagan's RFC opinion in June 2015 – some 16 months after she last saw plaintiff in February 2014 – stated that Mr. Montalto's symptoms began in January 2012 (R. 28). The ALJ observed that plaintiff worked at substantial gainful activity levels throughout 2012, belying Dr. Hagan's contention as to the date that his symptoms rendered him unable to work (*Id.*). The ALJ also pointed out that alhough Dr. Hagan's RFC states that she saw Mr. Montalto every three months for 30 minutes each time, the record only reveals two appointments after the alleged onset date of April 1, 2013 – one in November 2013 and one in February 2014 (R. 29).[8]

---

[7] While the regulations concerning medical opinion evidence have since changed, in considering claims filed prior to March 27, 2017 – such as this one – we follow the regulations in effect at that time. 20 C.F.R. § 404.1520c(a) (2017).

[8] Plaintiff attempts to bulk up the relatively few appointments he had with Dr. Hagen after his alleged onset date by suggesting that she reviewed the treatment notes from the other doctors Mr. Montalto saw at Advocate Lutheran Hospital. While it is true that Dr. Hagen was copied on progress and treatment notes from appointments Mr.

*Second,* the ALJ noted that in her examination in November 2013, Dr. Hagan reported plaintiff had normal gait, strength and sensation, which are contrary to the "excessive" limitations Dr. Hagan assessed (R. 29). Moreover, although Dr. Hagan limited Plaintiff to using his upper extremities only 25 percent of the day, the ALJ noted that there is no support in the medical record showing that Mr. Montalto had any upper extremity problems at all (*Id.*).

*Third,* the ALJ described other parts of Dr. Hagan's RFC that are not supported by the medical record. Specifically, the ALJ explained that the treatment record as a whole did not support Dr. Hagan's opinion that plaintiff needed to elevate his legs for 50 percent of the day (*Id.*). Additionally, Plaintiff had a normal gait and could walk more than 50 feet without a cane, which contradicted the statement in her RFC that Plaintiff had trouble walking (*Id.*). Finally, the ALJ also noted that Dr. Jilhewar testified at the hearing that he disagreed with Dr. Hagan limiting Plaintiff to "less than two hours of sitting or standing/walking" (*Id.*). The ALJ's acceptance of Dr. Jilhewar's opinion over Dr. Hagan's on this issue was not in error. *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007), *internal citations omitted* (an ALJ may discount a treating physician's medical opinion that "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability").

---

Montalto had with doctors at Advocate, there is no evidence that Dr. Hagen either reviewed or considered these records in forming her RFC opinion. Plaintiff suggests that the ALJ should have questioned him about his treatments with Dr. Hagan before relying on their alleged infrequency to Mr. Montalto's detriment. But the ALJ's discussion of the frequency of Mr. Montalto's visits with Dr. Hagan was made to point out the inaccuracy of her contention that she saw Plaintiff every three months. Indeed, while the ALJ noted that Plaintiff saw Dr. Hagan infrequently for his pain, she recognized the treatment Plaintiff received from his surgeon, several pain specialists, and a physical therapist, and then explained why that medical evidence failed to support Dr. Hagan's restrictive RFC (*see,* Def. Mem. at 7). It was entirely proper (and required by the regulations) for the ALJ to consider the number of times Plaintiff saw his primary care physician as part of her determination to give Dr. Hagan's opinion no weight. 20 C.F.R. §§ 404.1527(d)(2), 404.927(d)(2).

Mr. Montalto contends that the ALJ was wrong to say that Dr. Hagan's opinion is inconsistent with the medical evidence because various examinations showed tenderness in Plaintiff's back, a positive straight leg test, and a positive FABER test (Pl. Mem. at 15). Essentially, Plaintiff implies that these tests, showing that he had pain and some limitations, are conclusive proof that Dr. Hagan's restrictive RFC was accurate, and that the ALJ was wrong to discount it. But the ALJ acknowledged those medical test results and considered them in setting Plaintiff's RFC at the sedentary level. She gave Dr. Hagan's opinion no weight because she found that the record as whole did not support the restrictive RFC she advanced.[9]

Moreover, contrary to Plaintiff's argument, the ALJ considered the factors in 20 C.F.R. § 404.1527(c)(2) when deciding to give Dr. Hagan's opinion no weight. Specifically, the ALJ's opinion discussed the frequency of Plaintiff's treatment with Dr. Hagan (and notes that, in fact, Plaintiff did not have appointments with the doctor very often), mentioned that Dr. Hagan also treated Plaintiff's depression (that is, she was not an orthopedic specialist), and used specific examples in the record to explain why she found Dr. Hagan's opinion inconsistent with the evidence. Dr. Hagan did not administer any medical tests, and there is no evidence that she reviewed the x-rays Plaintiff had of his back and hip.

Finally, plaintiff contends that Dr. Hagan's opinion is entitled to weight because it was "consistent with the opinion of consultative examiner Dr. Biale" (Pl. Mem. at 17). But the ALJ discussed Dr. Biale's report and explained why she rejected his blanket statement that Mr. Montalto was unable to work, correctly noting that the determination of a person's ability to work

---

[9] Plaintiff argues that if the ALJ had any doubt about the basis of Dr. Hagan's opinion, she should have contacted her for clarification. But there is no evidence that the ALJ failed to understand the basis of Dr. Hagan's RFC, or was not able to interpret her opinion and compare it to the rest of the record evidence. There was no requirement that the ALJ contact Dr. Hagan merely because she found her opinion to be entitled to no weight. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

is one reserved for the Commissioner (R. 28). The ALJ pointed out that Dr. Biale examined Plaintiff within six months after surgery (nearly two years before Dr. Hagan's RFC opinion, and long before plaintiff's reported improvement from the use of E-Stim), and did not provide any specific functional limitations to support his opinion that Plaintiff was unable to work. The ALJ also noted that the state agency consultants reviewed Dr. Biale's report and concluded that Plaintiff could work with limitations. We find the ALJ's explanation for giving Dr. Hagan's opinion no weight adequate to allow us to trace her reasoning and supported by the evidence.[10]

### 2.

Nor did the ALJ err when she discounted the opinion of the testifying medical expert, Dr. Jilhewar, that Mr. Montalto met Listing 1.04A during a closed period from April 1, 2013 to November 19, 2015. We note that Plaintiff himself does not contend that the evidence shows he meets a Listing, but argues only that the ALJ failed to adequately explain why she rejected Dr. Jilhewar's opinion that he met a Listing. We disagree and find that the reasons she gave for discounting Dr. Jilhewar's opinion are sufficient to trace her reasoning.

"In considering whether a Plaintiff's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Kastner v. Astrue,* 697 F.3d 642, 647 (7th Cir. 2013), *citing Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004). In this case, the ALJ rejected Dr. Jilhewar's opinion because his sole reason for opining that Mr. Montalto met Listing 1.04A because of the "procedures" performed on him. Dr. Jilhewar

---

[10] Plaintiff also argues that the ALJ erred by speculating that Dr. Hagan's restrictive RFC opinion may have been a "sympathetic opinion based entirely on subjective complaints" (R. 29) (Pl. Mem. at 17). We agree that the ALJ offered an insufficent basis for that comment. "If the ALJ somehow found it necessary to offer such a view, he needed to root the observation in specific record evidence—for example, an express statement in a physician's treatment notes." *Hall v. Berryhill,* 906 F.3d 640, 643-44 (7th Cir. 2018). Nevertheless, as in *Hall,* we find that this error does not undermine the ALJ's broader conclusion that Dr. Hagan's RFC opinion was not entitled to any weight.

did not describe what factors he considered in determining that those procedures showed Mr. Montalto was disabled.

Listing 1.04A (disorders of the spine) covers conditions such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture, resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. Section A requires "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." Neither Dr. Jilhewar nor plaintiff points to evidence that plaintiff had a compromised nerve root with nerve root compression characterized by neuro-automatic distribution of pain or its equivalent, as required to satisfy this Listing.[11]

In rejecting Dr. Jilhewar's opinion, the ALJ analyzed the medical evidence that supported her determination that Plaintiff did not meet Listing 1.04A. She noted much of the evidence also discussed above: plaintiff's ability to walk more than 50 feet without a cane, normal gait, normal strength without atrophy, lack of spinal tenderness, x-rays showing the spinal fusion healing well, intermittent positive and negative straight-leg tests, lack of frequent and persistent presentations for pain, gaps in treatment, and success with the E-Stim unit. The ALJ also noted that Dr. Jilhewar himself did not find plaintiff to have neurological findings, and that, when presenting to the emergency room in June 2015 after being punched in the eye at his son's baseball game, the

---

[11] In his reply brief, plaintiff argues that plaintiff's pre-surgery MRI does show "neural impingement" as interpreted by his surgeon, Dr. Lim (Reply at 7-8). We find that Mr. Montalto's condition prior to surgery does not demonstrate that he had the factors required to meet Listing 1.04A after surgery in April 2013 (the same month as his alleged onset date). To the contrary, Dr. Lim notes that, at the conclusion of the surgical procedure, "[n]erual foramina were again probed and found to be widely and freely decompressed" (R. 343). The ALJ did not err in noting that the record evidence did not support a finding that Mr. Montalto had nerve root compression during the closed period identified by Dr. Jilhewar.

plaintiff did not exhibit any neurological deficits, had no back pain, and had "normal sensory", "normal motor" and "normal coordination" observed and non-tender and normal range of motion in his back (R. 24, 511). As we have explained above, the ALJ did not ignore Plaintiff's pain or the examination findings that show a positive straight leg test on occasion and positive FABER test. She acknowledged these issues and then described why the record evidence as a whole supported her conclusion that Plaintiff does not meet the standards for Listing 1.04A, but instead can perform work at the sedentary level.

Finally, we disagree that the ALJ erred when she both rejected Dr. Jilhewar's opinion that Plaintiff met Listing 1.04A for a closed period, but at the same time accepted his opinion (over that of the state agency consultants) that Plaintiff should be limited to sedentary instead of light work (Pl. Mem. at 19). The ALJ was not required to take an "all or nothing" approach in assessing Dr. Jilhewar's opinions, but instead properly assessed each opinion and the support for it. The ALJ's analysis shows why she was entitled to accept one of Dr. Jilhewar's opinions but not the other.

As we have explained above, the ALJ properly supported her determination to reject Dr. Jilhewar's opinion that Plaintiff met a Listing for a closed period that ended in November 2015. We can trace the ALJ's reasoning in setting plaintiff's RFC at the sedentary level because she adequately describes the medical evidence and how it supports her determination. The ALJ does not reject the state agency's doctors' opinions outright; she recognized that "there is a reasonable basis for these state agency medical consultant opinions as they are appropriate given the time these were prepared . . . [h]owever, afterward, the Plaintiff participated in more treatment with

injections and had a stimulator implanted for pain, which better supports the medical opinion from Dr. Jilhewar of a reduced exertional level of sedentary work over light work. (R. 29).[12]

The ALJ described all the medical evidence she considered in deciding to reduce the state agency consultants' "light" RFC to the sedentary level, including plaintiff's continued treatment for mild to moderate pain, the length of time he went between treatment, his presentations to his doctors showing no apparent distress, his choice to use a cane, and the successful reduction of his pain with the E-Stim unit. With respect to E-Stim, while plaintiff did not have permanent placement of a device until November 2015, he first reported a reduction in pain from use of an "at home" E-Stim unit in August 2013 (R. 366). We find no error in the ALJ's decision to reduce the state agency consultants' RFC assessment nor in her determination that the entire record supports a finding that plaintiff was able to work at the sedentary level. *Myles v. Berryhill*, 17cv4884, 2018 WL 3993731 (N.D.Ill. August 21, 2018) ("ALJ's RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion). The ALJ here fulfilled that duty by explaining, with specific references to the medical record, why she adopted parts of the medical opinions and rejected others and why the record, as a whole, supported the RFC.

---

[12] Plaintiff does not argue that the ALJ should have accepted the state agency opinions over that of Dr. Jilhewar; the agency doctors opined that Plaintiff had less restrictions and could work at the light level, a result the Plaintiff most certainly disputes.

## CONCLUSION

For the above reasons, we grant defendant's motion for summary judgment (doc. # 27) and deny plaintiff's request to reverse and remand (doc. # 14). The case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: March 28, 2019**